1

```
1                    IN THE UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF ARKANSAS
2                             CENTRAL DIVISION

3

4   UNITED STATES OF AMERICA,      .
                                   . Case No. 4:21-MJ-00291-PSH-1
5   PLAINTIFF,                     .
                                   .
6   VS.                            .
                                   .
7   SEIDY MARLENY FLORES-RIVERA,   .
                                   .
8   DEFENDANT.                     .
    . . . . . . . . . . . . . . .  .
9   UNITED STATES OF AMERICA,      . Case No. 4:21-MJ-00291-PSH-2
                                   .
10  PLAINTIFF,                     .
                                   .
11  VS.                            .
                                   .
12  SERGIO URIEL MUNOZ-RODRIGUEZ,  .
                                   . Little Rock, Arkansas
13  DEFENDANT.                     . November 29, 2021
    . . . . . . . . . . . . . . .  . 12:56 P.M.
14

15                           TRANSCRIPT OF

16                           BOND HEARING

17           BEFORE THE HONORABLE PATRICIA S. HARRIS

18               UNITED STATES MAGISTRATE JUDGE

19

20  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Colleen DuBose

21

22  Transcription Service:          Robin Warbritton
                                    Post Office Box 262
23                                  Vilonia, AR  72173

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

2

```
 1   APPEARANCES:

 2   For the Government:      Ms. Stacy R. Williams
                              U.S. Attorney's Office
 3                            Eastern District of Arkansas
                              Post Office Box 1229
 4                            Little Rock, AR  72203-1229

 5   For the Defendants:      Mr. Eugene Clifford
                              Zenith Law Group
 6                            1014 West 3rd Street
                              Little Rock, AR  72201
 7

 8                            Mr. Kale L. Ludwig
                              Ludwig Law Firm, PLC
 9                            1217 West Third Street
                              Little Rock, AR  72201
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS | BY THE COURT |
|---|---|---|---|---|---|
| DEFENDANTS' WITNESSES: | | | | | |
| Sergio Martinez | 8 & 14 | 13 | 17 | | |
| Daniel Martinez | 18 | | | | |
| | | | | | |
| GOVERNMENT'S WITNESS: | | | | | |
| Josh Laster | 23 | 29 | 41 | 44 | 42 |

4

P R O C E E D I N G S

(Call to order of the Court.)

THE COURT:  You may be seated.  Good afternoon.

MS. WILLIAMS:  Good afternoon, Your Honor.

MR. CLIFFORD:  Good afternoon, Your Honor.

MR. LUDWIG:  Good afternoon.

THE COURT:  We are here for bond hearing in two cases that are -- in which the defendants are co-defendants.  The first case we have ready -- or scheduled is *United States v. Seidy Marleny Flores-Rivera*, 4:21-MJ-00291-PSH.

Stacy Williams is here for the United States.  And Eugene Clifford is here as retained counsel for Ms. Flores.  Miranda Murray is here for the Pretrial Services Office.

Before we get started on that, I just wanted to ask counsel about a motion to issue subpoenas that was filed on the 28th.  I don't know, Ms. Williams, have you had an opportunity to see that motion?

MS. WILLIAMS:  I have, Your Honor.  I emailed it to the AUSA in Eastern Texas.

THE COURT:  Have you -- I know that -- have you gotten any sort of a response; do you know what their position is on this motion?

MS. WILLIAMS:  He has not responded, Your Honor.

THE COURT:  Okay.  Thank you.

Mr. Clifford, I know that you're asking for this

1   immediately, but the Government has an opportunity -- or

2   should have an opportunity to make a response to this motion.

3   And so, I'm not prepared to do anything on it right now,

4   unless you can show me or tell me about some law that would

5   allow me to -- to issue this without input from the United

6   States.

7          MR. CLIFFORD:  Your Honor, I don't intend on asking

8   you to do so.  So, we -- we sent it to the Government.  We

9   know that they're allowed to have some time.  We also sent

10  notice to the possible subpoenaed companies, as required.  So,

11  and they would have time to respond as well.

12         THE COURT:  Good.  Good.

13         MR. CLIFFORD:  I just wanted to get it started.

14         THE COURT:  Okay.

15         MR. CLIFFORD:  Just because I don't know how quickly

16  or slowly the procedures may occur at this point in time.

17         THE COURT:  Understood.  And it may be that -- well,

18  we'll just take it as it comes.  I mean, I know it -- but I'm

19  glad that they have been notified, the two businesses.  I've

20  actually done something like this, but in a civil case, in a

21  prisoner case, in which I -- there's a stay on discovery, but

22  I have issued subpoenas to third parties, indicating that they

23  are to be considered as a preservation order at that point.

24         So, anyway, I just want the parties to know I'm aware

25  of the filing of this motion and I will await the response of

1  the United States, and then we'll take it up at that time.

2          MR. CLIFFORD:  Yes, Your Honor.

3          THE COURT:  On the bond hearing for Ms. Flores, is

4  this a presumption case?

5          MS. WILLIAMS:  It is, Your Honor.  And just out of --

6  to save time, the evidence is the same, so if Agent Laster

7  could testify both for each defendant, I think it would might

8  make it more streamlined.

9          MR. CLIFFORD:  And that's what we agreed to.

10          THE COURT:  Okay.

11          MR. CLIFFORD:  And that's my understanding, is Mr.

12  Ludwig would --

13          MR. LUDWIG:  No objection, Your Honor.

14          MR. CLIFFORD:  -- would agree to that as well.  I

15  believe that there will be no factual difference as to what

16  the state -- or the Government is going to put on, and that

17  the only real factual difference is the status of the

18  individuals.

19          THE COURT:  Okay.  And the other case, just for the

20  record, that you're referring to, is *United States v. Sergio*

21  *Uriel Munoz-Rodriguez*, which is the same case number, correct?

22          MR. LUDWIG:  That is correct, Your Honor.

23          THE COURT:  And in that case, Mr. Ludwig is here as

24  retained counsel for Mr. Munoz.  And Ryan Bradley is here for

25  Pretrial Services.

1          Okay.  I don't have any problem with that at all.

2          I don't recall -- this is something else that came up

3    when I was looking over this case, I don't know that I

4    notified either defendant at their initial appearance of their

5    right for the United States to notify the country of their

6    origin of the fact that indictment is pending against them,

7    and they do have that right.  I don't know if you've had an

8    opportunity to talk to your clients.  I didn't have

9    information enough last week to know whether or not they were

10   actually citizens of the United States or not.

11         Will you attorneys confer with your clients about

12   that issue, and if you -- if your client wishes that their

13   country of origin be notified of their arrest and the

14   indictment, let Ms. Williams know?

15         MR. CLIFFORD:  Yes, Your Honor, I will.

16         THE COURT:  Okay.

17         MR. LUDWIG:  Yes, Your Honor.  And has any notice

18   been provided today?

19         MR. CLIFFORD:  No, it's --

20         THE COURT:  No, it's something that they would -- you

21   can request that notice be provided and law enforcement is

22   required to do that if your -- if the request is made by the

23   defendant.

24         MR. LUDWIG:  Thank you, Your Honor.

25         THE COURT:  Okay.

S. Martinez - Direct                          8

1        Okay.  So, are you going to stand on the presumption,
2   Ms. Williams?
3           MS. WILLIAMS:  We are, Your Honor, right now.
4           THE COURT:  Okay.  Then that moves things over to the
5   defense table, and you may proceed with --
6           MR. CLIFFORD:  Yes, Your Honor.  At this time we
7   would like to Sergio Ramirez -- Martinez.  I apologize.
8           THE COURT:  Sergio Martinez?
9           MR. CLIFFORD:  Yes, Your Honor.
10          THE COURT:  Okay.  Mr. Martinez, you may come
11  forward.  My Courtroom Deputy will swear you in.
12          MR. MARTINEZ:  Okay.
13          THE COURT:  And then you may be seated up here at the
14  witness table.
15          MR. MARTINEZ:  Okay.
16      (SERGIO MARTINEZ, DEFENDANTS' WITNESS, SWORN.)
17          THE COURT:  You may be seated.
18                       DIRECT EXAMINATION
19  BY MR. CLIFFORD:
20  Q   Will you please state your name for the record?
21  A   Sure.  Sergio Rene Martinez.
22  Q   And do you know the defendant here, Seidy?
23  A   Yes, sir, I've been knowing her for at least, I would say,
24  16 years.
25  Q   Okay.  And can you describe to the Court what your

1  relationship used to be and what it is now?

2  A    Okay.  Well, I am the father of her first child, which is

3  with us, Daniel Martinez.  And the relationship with her now

4  is ex-husband.  And, of course, with Daniel, you know, I'm

5  still the father.

6  Q    Okay.  And would you describe your relationship as a good

7  or bad one with Ms. Flores at this point?

8  A    Well, I would describe her as a, you know, hardworking

9  woman, always, you know, work hard around the house and take

10 care of my -- of our son.  You know, we had some personal

11 issues, so that's why we ended up, you know --

12 Q    Well, certainly, you're now exes?

13 A    Right.

14 Q    But have you been able to maintain a good relationship

15 with her since --

16 A    Yes.  Yes, we do.  And we actually, you know, get along.

17 We talk once in a while regarding to his school, you know, his

18 education.

19 Q    Okay.

20 A    So, we still, you know, have a good relationship.

21 Q    Do you have knowledges -- knowledge of her businesses?

22 A    I do.

23 Q    And what businesses do you know of?

24 A    Well, she rents houses, that I know of.  Well, when we

25 worked together, we had a couple of them, you know, starting.

1  But, after that, you know, she just kept working on the same

2  business.  So, I mean, that -- that I know of.  Anything else,

3  I don't know.

4  Q   Okay.  And are you aware of the property management; is

5  that what you're referring to?

6  A   Yes.

7  Q   And has she had that for a long time?

8  A   Well, I'm not sure how long that she done had it, but

9  after the -- we splitted, you know, she started -- well, right

10 after -- before, we started to work -- we started together,

11 you know, just renting a couple of houses.  But, as far as how

12 long she's been having it, I don't know exactly.  I cannot

13 tell you.

14 Q   Okay.  Would you say it was longer or shorter than the

15 past five years?

16 A   I would say longer.  Longer because we've been splitted

17 for eight years, so we had started together renting a couple

18 of houses.

19 Q   Okay.  And do you know if she employs anybody?

20 A   I'm not sure.  I've seen --

21 Q   It's okay if you don't.

22 A   Uh-huh.

23 Q   Okay.  And as far as you know, has she been taking care of

24 her children?

25 A   Yes, she does.

1  Q   And what's your knowledge of where the children are now?

2  A   They're with their grand -- grandparent, or my ex-brother

3  -- I mean, father-in-law.

4  Q   Okay.  And are you caring for one of the children?

5  A   Yes, I'm the -- actually, Daniel Martinez is with me right

6  now.

7  Q   Okay.  So, it's your understanding the children had to be

8  split up because of this?

9  A   Yes.

10  Q   And do you have knowledge that the children did all live

11  together before this incident?

12  A   Yes, sir.

13  Q   Okay.  Now, so you've known Seidy for at least well over a

14  decade?

15  A   Right.

16  Q   Have you ever known her to be in any real trouble?

17  A   No, sir.

18  Q   Okay.  Have you known her to always take care of her

19  children?

20  A   Yes, she does.

21  Q   Do you have any reason to believe that she would flee or

22  take off at any point?

23  A   No, sir.

24  Q   Do you know about how close she is to getting to being a

25  citizen?

1    A   Well, she is working on it.

2    Q   Okay.

3    A   She's working on it.  To become a U.S. Citizen takes a

4    while, so it's a process.

5    Q   Okay.  And you're here legally, is my understanding?

6    A   Yes, sir.  I'm a nationalized U.S. Citizen.

7    Q   Okay.  If the Court asks you to make sure that, you know,

8    Seidy is doing what she needs to do and things of that nature,

9    and checking in, would you be willing to do that?

10   A   Yes, sir.  I don't mind.

11   Q   Okay.  And the Court may ask you to say -- you know, if

12   she takes off or if there's a problem, that the Court would

13   ask you to report that back; would you be willing to do that?

14   A   Yes, sir.  I don't mind.

15   Q   Okay.  About how far do you live from her family home?

16   A   About 20 minutes.

17   Q   Okay.  So it's not -- you're not hours away at this point?

18   A   No.

19   Q   Okay.

20           MR. CLIFFORD:  No further questions, Your Honor.

21           THE COURT:  Thank you.

22           Ms. Williams?

23           MS. WILLIAMS:  Yes, Your Honor.  Could you give me

24   one second?

25           THE COURT:  Sure.

1                           CROSS EXAMINATION

2    BY MS. WILLIAMS:

3    Q    Hello, Mr. Martinez.

4    A    Hi, ma'am.

5    Q    You said Ms. Seidy, she has several businesses, correct?

6    A    Correct.

7    Q    Are you aware of the one at 7400 Knollwood?

8    A    7400 Knollwood?  It sounds familiar to me, but it doesn't

9    click on my head.

10   Q    Do you know her ex-husband?

11   A    A little bit.

12   Q    Were you close to them whenever they were married?

13   A    No.  No, ma'am.  No, ma'am, we weren't.

14   Q    Did you know that he was indicted for dealing

15   methamphetamine?

16   A    I'm -- well, just been hearing all over, you know, just

17   people gets to talk, but, really, you know, just listening to

18   it.  But, you know, because, you know, people knows each other

19   a lot, you know, so.

20   Q    Would it surprise you that 16 kilograms of methamphetamine

21   were found at her business at 7400 Knollwood?

22   A    No, ma'am, I don't know anything about that.

23          MS. WILLIAMS:  No further questions, Your Honor.

24          THE COURT:  Any follow up?

25          MR. LUDWIG:  Your Honor, quick question, just

S. Martinez - Direct                                    14

1  procedural-wise, am I allowed to step in here, or would you

2  like me to finish at then end or --

3          THE COURT:  You know, that's a good question, and I

4  probably -- I probably should have come to you second, instead

5  of --

6          MS. WILLIAMS:  I apologize, Your Honor.

7          THE COURT:  That's okay.  I said your name, so.

8          Go ahead.  Jump in now, please.

9          MR. LUDWIG:  Okay.

10     (Direct Examination of Mr. Martinez by Mr. Ludwig taken

11  out of turn as follows.)

12                        DIRECT EXAMINATION

13  BY MR. LUDWIG:

14  Q   Mr. Martinez, my name is Kale Ludwig.  I'm here on behalf

15  of Sergio.  I'm not going to rehash everything Mr. Clifford

16  discussed with you, but I am going to ask some specific

17  questions about Mr. Rodriguez.  Okay?

18  A   Sure.

19  Q   Approximately, how long have you known Mr. Rodriguez?

20  A   About a -- I would say about a year, a year and a half.

21  Q   Okay.

22  A   I would say.

23  Q   Do you understand that he has intentions of marrying

24  Seidy?

25  A   I do, sir.

1  Q   Okay.  Does he, in fact, live with Seidy at this time?

2  A   That I'm aware of, he does.

3  Q   Okay.  And when he's in the home, do you have any

4  knowledge about him helping out with the children?

5  A   Well, he does.  He, actually, you know, when my son has

6  foot -- I mean, basketball games and track, he takes him to

7  the track field when I'm not able to.

8  Q   So, he kind of steps in and helps you out; is that right?

9  A   Yes, he kind of steps in and helps.  Yes, he does.

10 Q   Okay.  What about the other two children of Ms. Seidy's,

11 does he help with those children or do you have knowledge

12 about that?

13 A   I do have knowledge that he helps --

14 Q   Okay.

15 A   -- her.  I don't know, you know, with the chores or

16 anything, because I don't live there, but.

17 Q   Sure.  Sure.  Okay.  Would you say that Sergio is a good

18 influence over your child?

19 A   Yes, he -- he is.  I mean, I had opportunity to talk to

20 him a couple of times.

21 Q   Okay.

22 A   And that, from what I'm aware, you know, he's a good guy.

23 Q   Have you known him to do anything that's disrupt --

24 disruptive in the family home?

25 A   No, sir, not that I'm aware.

1  Q   Okay.  What about the businesses, do you know whether he

2  helps out in Ms. Seidy's businesses at all?

3  A   I -- I see him around the house working and stuff like

4  that, but I -- I'm not aware, you know, what he does or

5  anything like that, I couldn't tell --

6  Q   Would you say he's a hardworking guy?

7  A   Huh?

8  Q   Would you say he's a hardworking guy?

9  A   He is -- he's a hardworking guy, you know, he takes care

10  of cleaning and stuff like that, but as far as his work, I

11  don't know much about it.

12  Q   Okay.  Have you ever had any conversations with Sergio --

13  or Mr. Rodriguez where he discussed going back to Mexico or

14  fleeing the United States?

15  A   No, sir.  We're not that close together, you know.

16  Q   Okay.

17  A   We do talk once in a while, but just a little bit, not

18  much.

19  Q   It's fair to say he's never discussed that with you?

20  A   No, he's never discussed that with me.

21  Q   Okay.

22          MR. LUDWIG:  No further questions, Your Honor.

23          THE COURT:  Okay.  Does that raise anything for you,

24  Ms. Williams?

25          MS. WILLIAMS:  No, Your Honor.

S. Martinez - Redirect                              17

1          THE COURT:  All right.

2          MR. CLIFFORD:  Follow up on the cross?

3          THE COURT:  Ms. Williams's?  You may, yes.

4          MR. CLIFFORD:  Yes.

5       (Redirect Examination of Mr. Martinez by Mr. Clifford

6   taken out of turn as follows.)

7                         REDIRECT EXAMINATION

8   BY MR. CLIFFORD:

9   Q   Mr. Martinez, to your knowledge, was Ms. Flores ever

10  indicted for anything with methamphetamine previously?

11  A   No, sir.

12  Q   And do you have knowledge that Mr. Cesarz and Ms. Flores

13  were separated at the time?

14  A   Yeah, they -- when -- when -- the question one more time,

15  sir?  I couldn't --

16  Q   Did you -- were you aware that they were separated when

17  that indictment came down, that Ms. Flores was no longer with

18  Mr. Cesarz?

19  A   Yes, sir.

20  Q   And do you have knowledge of why they split up?

21  A   Well, from what I know from my son, you know, it's like

22  physical violence and stuff like that, that I'm aware of.  I

23  -- I don't know anything else.

24  Q   Okay.

25          MR. CLIFFORD:  Nothing further, Your Honor.

                    D. Martinez - Direct                    18

1              THE COURT:  Okay.  Anything else?

2              MS. WILLIAMS:  No, Your Honor.

3              THE COURT:  Okay.

4              MR. LUDWIG:  No, Your Honor.

5              THE COURT:  All right.  Thank you.  You may stand

6   down.

7              THE WITNESS:  Okay.

8              THE COURT:  Thank you.

9       (Witness steps down.)

10             THE COURT:  You may call your next witness.

11             MR. CLIFFORD:  Your Honor, we will rest,

12  understanding that we may have questions for any witnesses

13  that Mr. Munoz-Rodriguez calls.

14             THE COURT:  Okay.  Thank you.

15             Mr. Ludwig?

16             MR. LUDWIG:  Your Honor, at this time, I would like

17  to call to the stand Daniel Martinez.

18             THE COURT:  Come forward, Mr. Martinez, and my

19  Courtroom Deputy will swear you in.

20       (DANIEL MARTINEZ, DEFENDANTS' WITNESS, SWORN.)

21             THE COURT:  You may be seated up here, please.

22                     DIRECT EXAMINATION

23  BY MR. LUDWIG:

24  Q   Mr. Martinez, thank you for being here today.  Would you

25  please state your name for the record?

D. Martinez - Direct                                    19

1   A   Daniel Martinez.

2   Q   And how old are you?

3   A   13.

4   Q   And how long have you known Sergio Rodriguez?

5   A   About two years.

6   Q   Does he act as a stepfather to you?

7   A   Yes.

8   Q   You understand he's engaged to your mother?

9   A   Yes.

10  Q   Does he help out around the house?

11  A   Yes.  A lot.

12  Q   A lot?

13  A   Uh-huh.

14  Q   Is he a good fatherly figure to you?

15  A   Yes.

16  Q   I understand you have two younger brothers; is that right?

17  A   Yes.

18  Q   Approximately, how old are they?

19  A   One is three and one is four.

20  Q   And do you know who has been helping out with them while

21  he's been in custody?

22  A   My grandpa.

23  Q   Your grandpa?

24  A   Uh-huh.

25  Q   Approximately, how old is your grandfather?

D. Martinez - Direct                                      20

1  A    I believe 56 or 54, somewhere there.

2  Q    And does Mr. Rodriguez help out with those younger

3  children a lot?

4  A    Yes.

5  Q    Tell me some things that he does around the house that --

6  that helps them.

7  A    He cleans.  He feeds them.  He plays around with them.

8  And that's about it.

9  Q    Is it fair to say that he's involved in the daily

10 activities of their life every day?

11 A    Yes.

12 Q    Is he also involved in your life every day?

13 A    Yes.

14 Q    Would you say that you need him around?

15 A    Yes.

16 Q    Would you say that your younger siblings need him around?

17 A    Yes.

18 Q    Does he exhibit love and affection towards your mother?

19 A    Yes.

20 Q    Have you ever known him to be violent towards your mother?

21 A    No.

22 Q    Towards any of -- you or your siblings?

23 A    No.

24 Q    What about has he ever been violent to anyone outside the

25 house, to your knowledge?

D. Martinez - Direct                                21

1  A    No.

2  Q    Do you understand that before the current arrest, that

3  your mother and Mr. Rodriguez went down and got a marriage

4  license?

5  A    Say that again, please.

6  Q    Do you -- that's okay.  Do you understand before the

7  arrest, that pursuant to their engagement, that they've

8  already received a marriage license?

9  A    Yes.

10 Q    Has Mr. Rodriguez ever talked with you of returning to

11 Mexico?

12 A    No.

13 Q    Has he ever -- did he -- has he made clear intentions to

14 stay here in Arkansas?

15 A    Yes.

16 Q    Made clear intentions to stay with you and your siblings?

17 A    Yes.

18 Q    Would you say that he's a good influence?

19 A    Yes.

20         MR. LUDWIG:  No further questions, Your Honor.

21         THE COURT:  Thank you.

22         Okay.  Mr. Clifford?

23         MR. CLIFFORD:  Yes, just a few questions.

24 BY MR. CLIFFORD:

25 Q    Your grandfather that's caring for your brothers, does he

D. Martinez - Direct                                          22

1   speak English?

2   A    Like 20 percent, not much.

3   Q    Okay.  Would it be difficult for him to take on a --

4   essentially both parents' roles with his limited ability with

5   English?

6   A    I don't know.

7   Q    Do you think he would be able to handle them going to --

8   registering for school and things like that, or would it be

9   difficult?

10  A    It would be -- it would be okay.

11  Q    Okay.  All right.  Is it your understanding that -- from

12  your mother, that she intended on marrying Sergio?

13  A    Yes.

14  Q    And, to your knowledge, have they always stated they

15  wanted to be around here?

16  A    Yes.

17  Q    Okay.

18          MR. CLIFFORD:  No further questions, Your Honor.

19          THE COURT:  Okay.

20          MS. WILLIAMS:  No questions for this witness.

21          THE COURT:  Okay.  Thank you.

22          You may stand down.  Thank you.

23      (Witness steps down.)

24          THE COURT:  Do you have any additional witnesses?

25          MR. LUDWIG:  No additional witnesses, Your Honor.

Laster - Direct                                        23

1        THE COURT:  Okay.  Do you rest, both?

2        MR. CLIFFORD:  Yes, we rest.

3        MR. LUDWIG:  Yes, Your Honor.

4        THE COURT:  Okay.  I'm going to find that you've

5   overcome the presumption.  I'm going to move the case back to

6   Ms. Williams to put on evidence in favor of her position.

7        MS. WILLIAMS:  Yes, Your Honor.  Was Mr. Martinez

8   supposed to be a third party custodian?  I don't think -- was

9   that --

10        THE COURT:  I think that was an option thrown out

11   there.

12        MR. CLIFFORD:  It was just an option thrown out.  I'm

13   not sure how the Court, being -- if the Court wants him to do

14   so, he will do so.

15        THE COURT:  Understood.

16        MR. CLIFFORD:  That's -- that's how we wanted to

17   present that.

18        THE COURT:  Okay.

19        MS. WILLIAMS:  Okay.  The United States calls Special

20   Agent Josh Laster.

21        THE COURT:  You may come forward and my Courtroom

22   Deputy will swear you in, Special Agent.

23      (JOSH LASTER, GOVERNMENT'S WITNESS, SWORN.)

24                        DIRECT EXAMINATION

25   BY MS. WILLIAMS:

1  Q   Please state your name.  (Clears throat.)  Excuse me.

2  A   Josh Laster.

3  Q   How long have you been with DEA?

4  A   I've been with DEA approximately ten years.

5  Q   Are you familiar with Ms. Flores?

6  A   Yes, I am.

7  Q   Are you familiar with her other than this case?

8  A   Yes.

9  Q   Has DEA in Little Rock also been looking into Ms. Flores?

10 A   We have, yes.

11 Q   For how long?

12 A   Since 2019.

13 Q   What started that investigation?

14 A   It was an interview with a cooperating defendant, with

15 another TFO out of the Little Rock District Office.  The

16 cooperating defendant named Seidy Flores as a multi-kilogram,

17 multi-pound methamphetamine distributor.

18 Q   And do you -- does DEA still believe that she is?

19 A   Yes, we do.

20 Q   And what happened in -- to get her indicted in Eastern

21 Texas?

22 A   On September 28th, 2021, the Dallas -- or the DEA Dallas

23 Field Division was conducting a surveillance operation of a

24 suspected stash house.  A stash house storing multiple

25 kilograms of methamphetamine.  They observed an individual

1  walk outside of an apartment and then get into a white Dodge
2  Ram 3500 pickup truck that returned to Ms. Flores.  That
3  person then exited -- I'm sorry, let me back up.  The person
4  walked out of the apartment carrying a gold colored bag, went
5  into the truck, in Ms. Flores's truck, met for briefly, for a
6  few minutes, exited, and then the truck departed the location.
7      Agents and TFOs conducted surveillance on that truck and
8  followed it to a gas station in Garland, Texas, where they
9  observed Ms. Flores and Mr. Munoz exit the truck and hand that
10 gold colored bag off to another individual from Little Rock.
11     And they followed that person from the gas station,
12 conducted a traffic stop, which resulted in the seizure of
13 five kilograms of methamphetamine that was concealed inside
14 the gold colored bag.
15         THE COURT:  Okay.  How much?  I'm sorry.  You're
16 going so fast.
17         THE WITNESS:  Five kilograms.
18 BY MS. WILLIAMS:
19 Q   That methamphetamine, was it supposed to be -- or the
20 proceeds of that, supposed to be brought back to Ms. Flores in
21 -- in Benton?
22 A   According to a later interview, yes.
23 Q   And what came out in that interview?
24 A   So, they interviewed the subject that was arrested with
25 the five kilograms.  His name was John Allen Bloomfield.  He

1  stated he was working on behalf of Ms. Flores to distribute

2  methamphetamine for her, which after distributing the

3  methamphetamine, the proceeds would be taken back to her

4  either at her store or at her residence.

5  Q   And did she give -- did he give the -- an address that

6  actually is one of Ms. Flores's addresses?

7  A   Yes.  He identified it as 14824 Chicot Road in Mabelvale,

8  Arkansas, which was the registered address on the vehicle that

9  they were stopped in that day, the white truck.

10 Q   And that vehicle returned to Ms. Flores?

11 A   Yes, it did.

12 Q   Can you go back and explain to the Court what happened

13 with the 16 kilograms of methamphetamine in 2019?

14 A   So, in, I think it was late 2019, I think in November,

15 another group in the Little Rock District Office was

16 conducting an investigation into a Manuel Cesarz (phonetic).

17 They developed a cooperating source, conducted controlled

18 purchases from Cesarz.  They identified 7400 Knollwood as a

19 location of where methamphetamine was being purchased from and

20 distributed from.

21 Q   Let me stop you real quick.  Is that Ms. Flores's ex-

22 husband?

23 A   Yes, it is.

24 Q   Okay.  Please proceed.

25 A   Yes.  So, with the purchase -- controlled purchases, they

1  acquired a search warrant and executed a search warrant, and

2  that was when they discovered or recovered the 16 kilograms of

3  methamphetamine inside, underneath, I believe it was a water

4  heater in the garage.  But Mr. Cesarz was on scene, was

5  present during the execution of the search warrant, he was

6  arrested.  And there was also multiple firearms seized as

7  well.

8  Q   Was Ms. -- did Ms. Flores arrive at the residence when the

9  search warrant was happening?

10 A   It was -- it was afterwards.  After they had already

11 seized the methamphetamine.  The investigators talked to Mr.

12 Cesarz, he recommended that Seidy, Ms. Flores, come to the

13 house to secure the residence after we had executed the search

14 warrant.  And then, Ms. Flores advised agents that she was Mr.

15 Cesarz's ex-wife.

16 Q   And was that one of her rental properties that it was

17 found?

18 A   Yes.

19 Q   Do you believe that Ms. Flores just picked up where her

20 husband left off in dealing methamphetamine?

21 A   It's hard to say.  I wasn't the investigation -- or the

22 investigator in that case.  From everything that we know, and

23 sources that we've interviewed, is that Ms. Flores was the

24 primary distributor.  We think that house, 7400 Knollwood, was

25 only used being -- as being used as a stash location, which

1  would be -- the methamphetamine would be broken down,

2  separated, and then distributed to other customers.

3  Q   Have you had other proffers where cooperating defendants

4  and/or informants have mentioned Ms. Flores?

5  A   Yes.  I personally interviewed a Little Rock Police

6  Department confidential source who identified -- not by name,

7  but the location of her store, that there was methamphetamine

8  distributed -- being distributed there.  And then, another

9  subject she was involved with was named as a customer of hers.

10 Q   Do you know if Mr. Munoz is here legally in the country?

11 A   Yes, he's here illegally.

12 Q   Oh, are you sure?

13 A   That's what he told us when we -- when we talked to him

14 when we arrested him.

15 Q   Okay.  Is there -- what other information can you provide

16 the Court about Ms. Flores's methamphetamine dealings?

17 A   The information that we have from sources is that she was

18 acquiring large shipments of liquid meth and/or powder

19 methamphetamine, being shipped from Dallas to Little Rock, and

20 it would go to some of her locations that he -- she has

21 interest in, or either her rental properties, where this

22 methamphetamine would be converted into crystal meth and then

23 later sold.

24 Q   Was she -- when she was arrested, did she have a firearm

25 on her?

1  A   Yes, she did.

2  Q   And you said you recovered two firearms from her residence

3  at 7400 Knollwood, back in 2019?

4  A   There was a -- I think there was an AR-15 semiautomatic

5  rifle, and then a handgun that was recovered, that Mr. Cesarz

6  was charged with.

7  Q   Is that consistent with large level dealing of narcotics?

8  A   We see that regularly, that large multi-kilogram, you

9  know, multi-pound distributors, typically carry firearms to

10 protect their business or their operation.

11 Q   And I know you know this isn't my case, am I missing

12 anything?

13 A   I don't think so.

14 Q   Okay.

15         MS. WILLIAMS:  No further questions, Your Honor.

16         THE COURT:  Okay.  Thank you.

17         Mr. Clifford, you may cross.

18         MR. CLIFFORD:  Yes.

19                     CROSS EXAMINATION

20 BY MR. CLIFFORD:

21 Q   Agent Laster, this --

22 A   Uh-huh.

23 Q   -- this isn't our first time meeting.  I met you when they

24 were arrested, correct?

25 A   Correct.

Laster - Cross                                              30

1   Q   And we -- we spoke?

2   A   Correct.

3   Q   So you know that I represent Ms. Flores.  I'm going to ask

4   you a few questions about what you just testified to.

5   A   Okay.

6   Q   Okay.  All right.  You brought up a lot about 2019 and

7   that arrest, correct?

8   A   I did.

9   Q   No indictment was ever given to Ms. Flores, correct?

10  A   No.  We didn't --

11  Q   Okay.

12  A   -- we didn't have enough evidence to formally charge her.

13  Q   Okay.

14  A   We did see her the day before at the Knollwood address,

15  before the day --

16  Q   Sure.  Sure.  Sure.

17  A   -- the day before the execution of the search warrant.

18  Q   Because her -- the father of her children lived there?

19  A   Correct.

20  Q   Correct?  And you never made an arrest for her --

21  A   No.

22  Q   -- based on anything that you had there, correct?

23  A   No, it wasn't me.  I'm just speaking on behalf of our

24  office.  It wasn't my investigation.

25  Q   Yeah.  And I'm going to get to that, because neither of

1  these are your investigations?

2  A    Correct.

3  Q    So, you're just going by what someone else has told you

4  that someone else has told you that they had?

5  A    I was present during that search warrant.

6  Q    Which search warrant?

7  A    At 7400 Knollwood.

8  Q    Okay.  7400 Knollwood.  There was no -- nothing that was

9  owned by Ms. Flores there, was there?

10 A    Not to my knowledge, other than she was renting the

11 property -- or she had an interest in the property or paying

12 the actual owner that she was renting the property.

13 Q    She was renting the property?

14 A    Correct.

15 Q    Did you ever see any paperwork like that?

16 A    I did not.

17 Q    Okay.  So, you're just going by what someone else told

18 you, correct?

19 A    Yes.

20 Q    Okay.  So, because when you say it like that, it makes it

21 sound like you were there and you saw it.  But you never saw

22 anything like that?

23 A    Not any paperwork.

24 Q    Okay.

25 A    No.

1  Q    Because, in fact, it was just her ex-husband renting a

2  house, wasn't it?

3  A    Well, he was living there.  And I will -- I will add that

4  investigators, as we went into the house, the only thing we

5  found was a bed in the master bedroom with some user amount of

6  methamphetamine --

7  Q    Uh-huh.

8  A    -- the firearms.  And then there was no furniture.  There

9  was -- there was no plates or silverware or anything.

10 Q    Uh-huh.  Certainly.

11 A    I think the kitchen stove was not even hooked up.  It

12 didn't -- it didn't look like -- it didn't appear that someone

13 was living there on a regular basis.

14 Q    Sure.  And would that be consistent with someone that just

15 split up with their wife as well?

16 A    I suppose so.

17 Q    Yeah.  Okay.  And then, when you said that Ms. Flores came

18 to the residence, that was after -- at the request of her

19 ex-husband to come lock it up, correct?

20 A    Correct.

21 Q    It wasn't you just kind of happened upon her being there,

22 correct?

23 A    No, she was -- he referred to her -- he recommended she

24 would come, then she later showed up as we were finishing up

25 the search warrant.

1  Q    Sure.  Because that's the person that he knew, his

2  ex-wife?

3  A    Correct.

4  Q    Okay.  And you said that you had this investigation for

5  years now on Ms. Flores?

6  A    Correct.  We've had information on her.

7  Q    Well, you said investigation, but yet nothing has ever

8  come of it, correct?

9  A    No.

10 Q    Okay.  Now, there was something said that you also found

11 firearms where Mr. Cesarz was, correct?

12 A    Correct.

13 Q    In your investigation of that place, had you ever even

14 seen Ms. Flores there?

15 A    Like I said, I was not the one doing the investigation.

16 Q    Okay.  Certainly.

17 A    Other agents can testify that they saw her the day before

18 arrive at the house and then left.

19 Q    Okay.  But you can't testify to anything like that.  And

20 I'll let you know that I was the attorney for Mr. Cesarz, so

21 --

22 A    Okay.  No, I --

23 Q    -- I'm aware of what happened.

24 A    -- I wasn't there during the surveillance.  I was only

25 there during the execution of the search warrant.

1    Q    Okay.  All right.  So you can't testify to anything about
2    the specifics of how that went down?
3    A    Just other than what was found there, that he was present,
4    and she showed up after the fact upon his request, and that's
5    basically it.  I know -- I know where the majority of the
6    methamphetamine was located, and then they did find the
7    firearms inside the house.
8    Q    Sure.  Were any of -- none of those were registered to Ms.
9    Flores, were they?
10   A    I don't -- I don't have any knowledge of that, of who they
11   were registered to.
12   Q    Okay.  And he, in fact, pled guilty to all of this, didn't
13   he?
14   A    I -- I -- I don't know for certain.
15   Q    Okay.
16   A    I just know that he was indicted.  So, to further explain,
17   I was there as a -- someone that was acting as kind of like a
18   SWAT Team member to help execute the warrant, secure the
19   premises while the case agents conducted the search.
20   Q    Sure.  Okay.  All right.  And on the Texas investigation,
21   you were not an agent on that either, correct?
22   A    That's correct.
23   Q    So, all the information that you're giving the Court is
24   based on what someone else has told you?
25   A    It's based on a -- a TFO from the DEA Dallas Field

1 Division.

2 Q    And this was TFO Solis, correct?

3 A    Correct.

4 Q    Okay.  He was here, wasn't he?

5 A    He was.  He was here.  He was present when we arrested Ms.

6 Flores and Mr. Munoz.

7 Q    And then he left, correct?

8 A    Yes.

9 Q    How long did you see him for?

10 A    At least two days.  He was here for two days.

11 Q    Okay.  Okay.  Now, your -- is it your understanding that

12 she's distribute -- that she's doing the distribution; that's

13 what your understanding is?

14 A    Yes.

15 Q    But all the people that were indicted down in Texas, they

16 were indicted in the beginning -- the beginning or late 2020,

17 correct?

18 A    The persons that were involved in the surveillance that

19 they conducted, they were arrested all in the same day of that

20 incident.  And then, she was not arrested -- Ms. Flores and

21 Mr. Munoz was not arrested, and they were later indicted.

22 Q    But they -- the case has been going on since 2021, without

23 Ms. Flores being involved, correct?

24 A    From what I understand, this was her first incident --

25 Q    Okay.

1  A   -- that she appeared in their investigation.  I'm not sure

2  when their investigation started, but this is -- this is what

3  I -- from what I understand.

4  Q   And that's -- this is where I'm going, is that basically

5  what your understanding is, is that Ms. Flores showed up one

6  time, on September 28th, and possibly allegedly did these

7  things.  This was not a long investigation of her.  She showed

8  up one time?

9  A   She showed up one time to their --

10 Q   Okay.  That's what --

11 A   -- from what I understand.

12 Q   That's -- I didn't want the Court to get the impression

13 that this is some sort of huge thing involving her.  She

14 showed up one time in that investigation, correct?

15 A   From what I understand.

16 Q   Okay.

17       MR. CLIFFORD:  No further questions.

18       THE COURT:  Okay.  Thank you.

19       MR. CLIFFORD:  Oh, I'm sorry, actually --

20 BY MR. CLIFFORD:

21 Q   On the Mr. Bloomfield, you said that he wanted to provide

22 information to you, correct?

23 A   He's provided information --

24 Q   Okay.

25 A   -- to DEA Dallas --

1  Q    Sure.

2  A    -- Dallas Field Division.

3  Q    Sure.  And is it your knowledge that confidential sources

4  or people that have just been arrested for possessing the

5  methamphetamine that you're talking about, they have -- they

6  have a strong desire to place the blame on someone else, don't

7  they?

8  A    I guess you can say that.

9  Q    Yeah.

10 A    I mean --

11 Q    Because he was the one that was actually caught with

12 everything?

13 A    Yeah, but it was observed that what was found on him was

14 obtained -- previously obtained from Mr. Munoz and Ms. Flores.

15 Q    And you've read the little sheet that was given, or you're

16 aware of the facts, basically?  I don't know if you are or

17 not.

18 A    Facts of --

19 Q    What you provided --

20        MS. WILLIAMS:  He provided me with that complaint.

21        MR. CLIFFORD:  Yeah.

22 BY MR. CLIFFORD:

23 Q    That actually Mr. Bloomfield -- even after this bag may

24 have been exchanged, that Mr. Bloomfield took it out of the

25 vehicle and was doing things with it after it had been given

1  to him, correct?

2  A    I'm not --

3  Q    I mean, it says it right here.  I mean --

4  A    -- I'm not sure what you're referring to.  I don't --

5  that's new -- new information to me.

6  Q               "Bloomfield opens the -- the door,

7                   reaches over and grabs the gold

8                   bag.  He's then seen adjusting the

9                   bag and moving the bag -- or

10                  adjusting the bag, and then gets

11                  back into the Yukon and drives

12                  away."

13     Correct?  So, there's even an interceding event between

14  that, correct?

15  A    So, I didn't know those specific details.  From what I

16  understand, and the reports that I've read and have received,

17  is that at some point while he met -- Mr. Bloomfield met with

18  Ms. Flores and Mr. Munoz at the gas station, the bag was

19  transferred to him.

20  Q    Uh-huh.

21  A    He was later traffic stopped.  They recovered that bag,

22  and inside the bag was five kilograms of meth.

23  Q    So, you would have no reason to refute that he was

24  actually seen doing things with the bag in between it being

25  given to him?

Laster - Cross                                              39

1   A    Yeah, I -- I didn't know that before today.

2   Q    All right.  And this is the information that I've been

3   given about this, correct?  Or you're not aware of it?

4   A    I'm not aware of it.  I don't know what information you've

5   --

6   Q    Okay.

7   A    -- you have there.

8            MR. CLIFFORD:  No further questions.

9            THE COURT:  Okay.  Mr. Ludwig?

10  BY MR. LUDWIG:

11  Q    Good afternoon, Officer Laster.  I'm Kale Ludwig.  We have

12  also met before; is that right?

13  A    That's right.

14  Q    I've got a pretty simple start or introductory question

15  for you.

16  A    Okay.

17  Q    I've listened very closely to all the information you've

18  given here today, and I wrote down two points.  One, you said

19  that my client admitted to being an illegal alien; is that

20  correct?

21  A    That's correct.

22  Q    And two, that he was in the vehicle with Ms. Flores; is

23  that also correct?

24  A    That's correct.

25  Q    That's all the statements that you've given here today

Laster - Cross                                                40

1  against my client; is that correct?

2  A    That's correct.

3  Q    Nothing else?

4  A    Nothing else.

5  Q    Okay.  Did you arrest Mr. Rodriguez?

6  A    Ms. Rodriguez?

7  Q    Mr. Rodriguez?  Did you arrest him?

8  A    Sergio Munoz?

9  Q    Correct.

10  A    Yes, I did.

11  Q    Did he have any weapons on him?

12  A    No, he didn't.

13  Q    Did he attempt to flee?

14  A    No, he didn't.

15  Q    Did he, in fact, come to you?

16  A    He did.

17  Q    He came to you to be arrested?

18  A    I called him on the phone and he came to the location of

19  where we had Ms. Flores stopped.

20  Q    You called him on the phone and he came to you, correct?

21  A    Correct.

22          MR. LUDWIG:  No further questions, Your Honor.

23          THE COURT:  All right.

24          Ms. Williams, do you have any follow up?

25          MS. WILLIAMS:  Just a few questions, Your Honor.

1                    REDIRECT EXAMINATION

2    BY MS. WILLIAMS:

3    Q    I thought nothing has come of it, of the investigation --

4    the Little Rock investigation, but Little Rock DEA did see Ms.

5    Flores with a gold bag with five kilograms of methamphetamine

6    in it, right?

7    A    Little Rock?  No.

8    Q    East -- or East Texas?

9    A    So, yeah, DEA Dallas.

10   Q    DEA Dallas?

11   A    Yes.  They saw -- they were conducting surveillance on a

12   suspected stash house.  They saw an individual leave that

13   house, walk into the parking lot, get into Ms. Flores's

14   vehicle with a bag.  That subject stayed in the vehicle for a

15   short time, then he exited the vehicle without the bag.  And

16   then, Ms. Flores's vehicle departed that location, and that's

17   when they were later seen at the gas station.

18   Q    And -- (clears throat) -- excuse me.  And you have been

19   present when people have proffered about Ms. Flores?

20   A    No.

21   Q    No, you haven't?

22   A    No.

23   Q    You just know that from your -- from Little Rock?

24   A    I just know that from those investigators that have done

25   those interviews, from their reports.

1   Q    And is that from a Little Rock investigation?

2   A    There's one Little Rock investigation and this current

3   investigation in -- conducted by DEA Dallas.

4   Q    So, in DEA Dallas's investigation, she only came up the

5   one time?

6   A    Correct.

7   Q    But in DEA Little Rock's investigation, she's come up

8   multiple times?

9   A    Correct.

10  Q    Okay.

11          MS. WILLIAMS:  No further questions, Your Honor.

12          THE COURT:  I have a question.  I got a little bit

13  confused about who was in this vehicle with the bag in -- in

14  Dallas.  Was -- were there -- do you know who was identified

15  as being in the -- in Ms. Flores's -- Ms. Flores's truck or

16  vehicle?

17          THE WITNESS:  Yes, Your Honor, it was -- it was Ms.

18  Flores and Mr. Munoz.  They were actually traffic stopped as

19  well, at the -- approximately at the same time when Mr.

20  Bloomfield was traffic stopped.  After they saw the exchange

21  of the bag -- or what they believed to be the exchange of the

22  bag, two traffic stops were conducted.

23          THE COURT:  Okay.

24          THE WITNESS:  They identified both Ms. Flores and Mr.

25  Munoz in the white Ram pickup.

Laster - By the Court                                    43

1    THE COURT:  Were there any drugs found in that
2    pickup?
3              THE WITNESS:  No, ma'am.  No, Your Honor.
4              THE COURT:  Okay.  And who was the person -- was the
5    person identified who left the house and got into the truck?
6              THE WITNESS:  He was arrested that same day.
7              THE COURT:  Who is that?
8              THE WITNESS:  A subject by the name of Mauricio Diaz
9    Abraham.
10             THE COURT:  Was he also in the truck at the time of
11   the traffic stop?
12             THE WITNESS:  No, Your Honor.  He -- he -- when they
13   departed the -- the suspected stash location, he actually --
14   he also departed in a separate vehicle and went a separate
15   direction, and he was later stopped -- or later apprehended.
16             THE COURT:  Okay.  That same day?
17             THE WITNESS:  Correct.
18             THE COURT:  Did he have any drugs in his vehicle?
19             THE WITNESS:  In the vehicle, not to my knowledge,
20   but they conducted a search warrant at that location, and I
21   believe they recovered approximately 17 kilograms from the
22   stash location.
23             THE COURT:  At a different stash location?
24             THE WITNESS:  The same stash location that Ms. Flores
25   and Mr. Munoz went to.

Laster - Recross                                    44

1          THE COURT:  Okay.  Did that confuse things more, or

2   does that clarify?

3          MR. CLIFFORD:  No, Your Honor, that's what their --

4   the allegations seem to indicate.

5          THE COURT:  Okay.  Okay.  All right.

6          You're welcome to ask follow up questions based on

7   what I just asked if you feel like you would like to do that.

8          MS. WILLIAMS:  No further questions.

9          MR. CLIFFORD:  No, Your Honor, I don't.

10                     RECROSS EXAMINATION

11  BY MR. LUDWIG:

12  Q   I just want to clarify, were there any -- was there any

13  cash in the vehicle when Ms. Flores and Mr. Munoz-Rodriguez

14  were stopped?

15  A   No, it wasn't listed in the reports, and TFO Solis did not

16  report any cash being seized.  So --

17  Q   Okay.

18  A   -- I don't believe there was a search conducted of their

19  vehicle.  They were just stopped solely for the purpose of

20  identifying the occupants.

21          THE COURT:  Okay.

22          MR. CLIFFORD:  Then I have a question now.

23          THE COURT:  Okay.

24  BY MR. CLIFFORD:

25  Q   So, nobody even knew who these two individuals were until

1  after they were stopped later, correct?

2  A    Correct.

3  Q    So, there was no investigation of her, there was no

4  nothing, except for they -- she may have been in the vehicle

5  and showed her license, correct?

6  A    Correct.

7           MR. CLIFFORD:  Okay.  No further questions.

8           THE COURT:  Anything else?

9           MR. LUDWIG:  No further questions, Your Honor.

10          MS. WILLIAMS:  No, Your Honor.

11          THE COURT:  All right.  You may stand down.  Thank

12  you.

13     (Witness steps down.)

14          THE COURT:  Any other testimony, Ms. Williams?

15          MS. WILLIAMS:  Was it -- no.  No, Your Honor, I don't

16  think so.

17          THE COURT:  All right.  I'm happy to hear argument.

18          MR. CLIFFORD:  We're prepared to give an argument how

19  ever -- in order -- whatever order the Court sees fit.

20          THE COURT:  How ever you guys want to do it is fine.

21  Do you want to make argument since the burden is on you?

22          MS. WILLIAMS:  Yes, Your Honor.

23          THE COURT:  You may go first, Ms. Williams.

24          MS. WILLIAMS:  First, I don't believe that the

25  release plan is sufficient, just the two of them go live

1  together in their home where they have been living and where

2  they have been distributing methamphetamine

3          And there -- there is no -- there's not even some

4  sort of conditions that have been -- do I need to pause for a

5  second?

6      (The Court confers with the Courtroom Deputy, off the

7  record.)

8          THE COURT:  Okay.  Okay.  Go ahead.

9          MS. WILLIAMS:  There have not even been conditions

10  that seem to curb that behavior.

11          Mr. Munoz is not in the country legally.  And so, I'm

12  saying he's a risk of flight.  I'm also saying that Ms. Flores

13  is a risk of flight.  We have evidence that she has crossed

14  the border multiple times, which I forgot to bring up.  And

15  so, I'm saying that she's -- they're both a risk of flight.

16          And Ms. Flores is a danger to the community, and I'm

17  saying that because her husband -- ex-husband was indicted

18  with -- in one of her properties with multiple kilograms of

19  methamphetamine, but that did not also curb her behavior.  She

20  seemed to step into his role, or may have always been the

21  leader.  And she has come up -- maybe she wasn't in Dallas's

22  investigation, but she's been in Little Rock's investigation

23  for 17 years.  The Court knows no indictment can come from

24  only a proffer; they have to have actual drugs on the

25  defendant, and they got that in Texas when she actually came

1   from a stash house with a gold bag and provided it to a

2   co-defendant who stated that he was distributing the

3   methamphetamine for her, and gave -- I understand that those

4   being arrested might put the blame on someone else, but he

5   gave Ms. Flores's address, back here in Mabelvale, Arkansas,

6   where he was supposed to be taking the proceeds.

7        And the United States doesn't believe that there is

8   any conditions or combinations of conditions that can stop Ms.

9   Flores from dealing methamphetamine.  She has a big -- she has

10   a big distribution.  And to stop her, she needs to be

11   committed to another district in Texas where she can face her

12   charges of the five kilograms of methamphetamine, which it's a

13   ten year statutory minimum.

14        And for Mr. Munoz, the United States would say that

15   he is a risk of flight.  If Ms. Flores -- although he is not

16   as culpable as Ms. Flores in this case, if she is detained, he

17   has no reason to stay in the United States and we would not be

18   able to find him if he were to flee to Mexico.

19        So, for those reasons, I would ask that they be

20   detained.

21        THE COURT:  Thank you.

22        Okay.  Mr. Clifford, you may argue.

23        MR. CLIFFORD:  Yes, Your Honor.

24        At this point in time, Ms. Flores has never been

25   convicted of any crime.  Now, I understand that her ex-husband

1   has been convicted of a crime, but he pled guilty to that.

2   And he was asked many times about this, and no arrests have

3   ever come.  They say they've had this multi-year investigation

4   about Ms. Flores and they've been watching her and they've

5   been doing this, and yet, they have nothing.

6        And even the allegations themselves are that Ms.

7   Flores may have held this bag for a few minutes.  And we're

8   obviously going to contest that.  We're going to say that

9   she's not guilty of that.  And that even in their own facts,

10  Mr. Bloomfield is seen handling the bag and doing things with

11  the bag, that happened after Ms. Flores gives it to him.

12       And these confidential sources, you know, everyone

13  says things that would help them get out of trouble.

14       But, here, we have an investigation, Ms. Flores shows

15  up, and they have nothing on her.  We haven't seen anything

16  that shows that they have anything on her.  If she was this

17  huge high level dealer, and they've been -- they've been

18  investigating her for years, because it wasn't just in 2019,

19  that's when Manuel was arrested.  They said they had

20  investigations before that, and they've got nothing on her.

21  Nothing.

22       All we have is that she has a few businesses.  She

23  used to do hair.  She's got rental properties.  I think just a

24  few rental properties.  A property management company.  She

25  employs other people.  She has her own family.  She's -- for

1   one, there's no way she's going anywhere without her children,

2   and her children are here.  They're citizens.  They're in

3   school.  She's going nowhere.

4          And she's not a danger to the community.  She's never

5   been convicted of a single thing in her entire life.

6          And at this point in time, she's not going anywhere,

7   she's not a danger.

8          You know, she -- let me look back through here -- I

9   think even in the report, the only thing that they could find

10  is a speeding ticket and failure to show insurance.  That's

11  the most criminal activity they've out of Ms. Flores.

12         Now, I understand the allegations are serious.

13  That's why we're here today.  Otherwise, I don't think we

14  would even be here if the allegations weren't serious.  But,

15  that's just what they are, allegations.

16         And at this point in time, there is nothing that

17  would show that Ms. Flores would run.  There is nothing that

18  would show that she's a danger.

19         And at this point in time, we ask that if the Court

20  wants electronic monitoring, we're okay with that.  If the

21  Court wants a third party custodian, we're okay with that.

22  We're okay.  We just want her to go back home to her children,

23  have her rental properties, stay here in Little Rock, and then

24  go to court in Dallas.  And that's it.  And that's all we need

25  and that's all we want.  We're not here to decide if she's

1    guilty or not guilty today.  But she just wants to go home,

2    take care of her family, and there's no reason that the Court

3    -- there's nothing in her past that indicates that she won't

4    do that.

5           So, we ask that that be done.  And we're willing to

6    submit to any conditions the Court is willing to give.

7           THE COURT:  Thank you.

8           MR. CLIFFORD:  Thank you.

9           THE COURT:  Mr. Ludwig?

10          MR. LUDWIG:  Your Honor, I, again, listened very

11   closely when the state argued their closing arguments.  All I

12   heard was that he's a risk of fleeing, that's he not as

13   culpable, and that he doesn't represent a danger to our

14   community.

15          Now, to say that he's a risk of fleeing doesn't -- it

16   doesn't really make sense with the current facts.  He self

17   reported his arrest.  They called him, he came and submitted

18   to an arrest.

19          Now, he had a chance to flee and chose not to flee.

20   He's not going to flee.  He's staying here, Your Honor.

21          Also, I heard her say that if Ms. Seidy is arrested,

22   that he has no reason to stay and that he'll flee.  Again, the

23   evidence here today suggests exactly the opposite, he'll be

24   here to watch the children.  He wants to take care of those

25   children, is involved in the daily activity of those

1   children's lives, and will be here to protect and help those

2   children.

3          Your Honor, I don't want to go over everything --

4   cover everything Mr. Clifford said, but we're also open to any

5   conditions the Court recommends.  You know, we certainly want

6   him to return home.

7          And, Your Honor, as I understand the standard is, you

8   know, the facts in this Court is whether it reasonably assures

9   the appearance of Mr. Rodriguez, and, you know, I think

10  everything here today denotes that he's got -- the Court has

11  more than a reasonable assurance of his appearance when

12  needed.

13         And so, with that, I thank you, Your Honor.

14         THE COURT:  Thank you.

15         You get the last word, Ms. Williams.

16         MS. WILLIAMS:  I keep going back to, Your Honor, that

17  Mr. Clifford keeps saying that we have nothing, we have

18  proffers and we never found her, her husband pled guilty, but

19  we -- we have five kilos in a bag in Texas that she was seen

20  carrying -- seen carrying, right?  That she was seen carrying.

21  That is not nothing.  That's five kilos of methamphetamine.

22         So, I ask that you commit her to Eastern District of

23  Texas.

24      (The Court confers with the Courtroom Deputy, off the

25  record.)

1          THE COURT:  And there's -- there's a hearing -- is

2     there a hearing scheduled in Texas in the event that I let

3     them go, tomorrow?

4          MR. CLIFFORD:  I believe the next hearing is January

5     11th, is my understanding.  There may be one sooner, but.

6          THE COURTROOM DEPUTY:  They're --they're supposed to

7     report tomorrow at 10:20.

8          THE COURT:  Is that from the earlier?

9          THE COURTROOM DEPUTY:  That's for the plea and

10    arraignment.

11         THE COURT:  Is that from when we saw them earlier?

12         THE COURTROOM DEPUTY:  Yes.

13         THE COURT:  That may have been changed.

14         THE COURTROOM DEPUTY:  Yes, could have been.

15         THE COURT:  Okay.

16         Okay.  I have to consider a lot of different factors

17    when I make a decision about detention.  And one of those

18    factors is the nature and circumstances of the offense, and

19    whether it involves controlled substances, firearms, crime of

20    violence, et cetera.

21         The crime with which these defendants are charged is

22    a controlled substance crime, with a significant quantity of

23    methamphetamine -- is it meth actual or meth --

24         MS. WILLIAMS:  I don't believe there's a crime lab --

25    we don't have a crime lab result yet, Your Honor.

1          THE COURT:  Okay.  Okay.  And so, certainly, that is
2   a significant, very serious crime.
3          Obviously, the weight of the evidence is -- it's not
4   a major factor in my consideration.  I know that there are two
5   sides to every story, and I recognize that the case is not put
6   on trial on here.  There's no evidence that either of the
7   defendants gave a statement or they admitted any involvement.
8   And so, that's not a significant factor for me.
9          I am to consider the history and characteristics of
10  the defendants, including family ties.  I know that both of
11  the defendants are from -- I think Ms. Flores is from Mexico
12  -- no, Guatemala, and Mr. Munoz is from Mexico.  He is an
13  illegal alien, as I understand.  Ms. Flores has a green card,
14  as I understand it.  Ms. Flores has family here.  She has
15  children here.  And she has resided in this community for a
16  relatively significant period of time and has businesses here
17  as well.  Those are factors that I will be considering.
18         Mr. Munoz is -- I don't have much information about
19  how long he's been here.  I don't know if that was contained
20  in the report.
21         MR. LUDWIG:  The report says 13 years, Your Honor --
22         THE COURT:  13 years.
23         MR. LUDWIG:  -- but I believe he's been here for 16.
24         THE COURT:  Okay.  So, Mr. Munoz has been in the
25  community for a significant period of time as well.

1    Neither has a criminal history of any significance,
2 or at all.  And that's a factor that I am required to consider
3 and do consider.  And for the same reason, they weren't --
4 neither one of them were on probation, parole, or any other
5 supervision at the time of the charges here.
6    I think that I can impose conditions that will
7 reasonably assure their appearance and the safety of the
8 community.
9    I am a little hesitant about it, because both
10 individuals are from foreign countries.  I'm not as concerned
11 about it for Ms. Flores because her family, her children are
12 here.
13    But, I'm going to impose some relatively strict
14 conditions.
15    And one of which will be for you, Ms. Flores, to turn
16 over your passport you have to your Pretrial Services Officer.
17    I'm going to -- I'm going to order that you show up
18 to Dallas on the date you're supposed to show up there, and
19 present yourself, and go further from there.  If you don't,
20 then you know what's going to happen.
21    But I'm going to impose -- I'm going to have you
22 monitored with ankle monitor -- or should I -- would I do
23 virtual monitoring?  What -- help me here.
24    MS. MURRAY:  Whatever the Court would like, Your
25 Honor.

1     THE COURT:  I want -- I want it to be where you can

2  know where they are.

3     MS. MURRAY:  With virtual monitoring, when they check

4  in, their location will be sent to the officer.  It can also

5  work in conjunction with RF, radio frequency, which is the

6  ankle monitor.

7     THE COURT:  They can both work together?

8     MS. MURRAY:  They can work together, yes, Your Honor.

9     THE COURT:  Explain that a little bit to me.

10     MS. MURRAY:  So, they'll have the ankle monitor on

11  their ankle, and that will monitor if they leave the

12  residence.

13     THE COURT:  If they're where they're supposed to be?

14     MS. MURRAY:  Correct.  And then, the virtual

15  monitoring, if they are allowed to leave the residence, if

16  they're allowed to work, visit with their attorney, have

17  court, and if they check in during those periods that they're

18  outside of the home, it will send the location to the

19  Probation Officer.

20     THE COURT:  Okay.  And can the Probation Officer

21  check as frequently as they wish to do so?

22     MS. MURRAY:  Yes, Your Honor.

23     THE COURT:  Okay.

24     MS. MURRAY:  It's all random, how ever the officer

25  sets it up.

1           THE COURT:  Can there be increased, more than usual?

2           MS. MURRAY:  Yes.  Whatever the Court would like.

3           THE COURT:  Okay.  Okay.  All right.

4           Okay.  Here is what I'm going to do, I'm going to

5 tell both of you what general conditions I'm going to impose

6 and any special conditions.  So, both of you take close

7 notice.

8           Both of you must not violate any federal, state, or

9 local law while you're on release.

10          You must cooperate in the collection of a DNA sample

11 if it's authorized.

12          You are -- you're authorized to go live in your home,

13 but I'm going to put both of you on an ankle monitor and on

14 virtual monitoring.  And I don't know if you understood what

15 Ms. Murray said, but that means that you're going to -- you're

16 going to be confined to -- I'm going to put you on home

17 detention, that means you are confined to your home with

18 certain exceptions, and I'll tell you what those are.  But if

19 you leave -- if you're not in where you're supposed to be,

20 then you're going to get revoked probably.  This is -- to me,

21 this was a real close call.  The fact that you didn't have any

22 criminal history was significant in my determination about

23 letting you go.  But, I won't be very understanding if there

24 are violations.  It won't be difficult for me to revoke you if

25 you don't comply.

1          You must keep your Pretrial Services Officer advised

2    if you change your phone number.  Because you're going to be

3    virtually monitored through your phone, you can't just change

4    your phone number and not be available.  You need to stay at

5    the house that you're living in as well.  Don't move.  Don't

6    pick up and go.  Because you're going to be monitored there in

7    the confines of your home based on the ankle bracelet you're

8    going to be wearing.

9          You are to continue with your employment that you

10   have.

11          You, Ms. Flores, are to -- to surrender your passport

12   to -- who is the pretrial -- are you the Pretrial Services

13   Officer?

14          MR. BRADLEY:  It will be Officer Steven Daniels.

15          THE COURT:  Steven Daniels.  Okay.  And is that --

16   okay.

17          You are not to obtain a passport or any international

18   travel document.

19          You are not to leave the Eastern District of Arkansas

20   unless it is to appear in court in Texas.  Is it in -- what

21   district in Texas is this?

22          MR. LUDWIG:  Eastern.

23          MS. WILLIAMS:  Eastern.

24          MR. CLIFFORD:  Eastern District, I think.  Yes.

25          THE COURT:  Okay.  You may travel to the Eastern

1  District of Texas to appear in court as required.  Other than

2  that, you are to remain in the Eastern District of Arkansas.

3          You are to avoid any contact with any other

4  co-defendant in this case.  I understand you live together and

5  so you're going to have contact with each other, but any other

6  co-defendant in this case, you do not need to have any contact

7  with.

8          Any witness in this case, you do not need to have any

9  contact with.

10          Do you understand?

11          MS. FLORES-RIVERA:  Yes.

12          MR. MUNOZ-RODRIGUEZ:  Yes, ma'am.

13          THE COURT:  You may not possess a firearm,

14  destructive device, or other weapon.  Do you have any firearms

15  in your home?

16          MS. FLORES-RIVERA:  (No audible response.)

17          MR. CLIFFORD:  No, Your Honor.

18          MR. MUNOZ-RODRIGUEZ:  No.

19          THE COURT:  You may not have firearms in your home at

20  all.  And you may not have them in your vehicle.  You may not

21  have any firearms in your -- in your work.  Okay?

22          MS. FLORES-RIVERA:  Uh-huh.

23          MR. CLIFFORD:  Yes, Your Honor.  The one that she did

24  have was confiscated at the arrest.

25          THE COURT:  Okay.  All right.  Well, just know you

1   are not authorized to do that, even though you're not a felon,

2   in pretrial -- because you're under indictment, I can impose

3   that on you.

4            You may not use alcohol excessively.

5            You may not use or unlawfully possess a narcotic drug

6   or other controlled substance unless it's prescribed to you by

7   a medical care practitioner.

8            I'm going to order you to submit to drug testing and

9   drug treatment at the discretion of your Pretrial Services

10  Officer.

11           As I said, I'm going to place you on virtual

12  monitoring -- monitoring, and ankle monitor, with home

13  detention.  That means you are to stay at your residence with

14  certain exceptions; you can work, you can attend religious

15  services, you can go to the doctor, you can go to court

16  appearances, you can meet with your attorney.  But you need to

17  keep your Pretrial Services Officer aware of any meetings or

18  plans that you have outside of the office that are within

19  these exceptions.  You can't just decide, well, I'm going to

20  go do this today without your Pretrial Services Officer being

21  aware and giving you permission to do so.

22           Do you understand?

23           MR. MUNOZ-RODRIGUEZ:  Yes, ma'am.

24           MS. FLORES-RIVERA:  Yes, ma'am.

25           THE COURT:  If there is anything that doesn't fall

1  within these exceptions that you wish to do, you need to get

2  permission ahead of time from your Pretrial Services Officer.

3          And again, if you do not abide by these requirements,

4  then we're going to have a problem.

5          You need to keep in touch with your lawyers every

6  couple of weeks.  You'll have -- I'm assuming you'll have

7  different lawyers in Texas once you get there.  I don't know

8  if that's the case or not, but whoever is representing you,

9  you need to keep in touch with them every couple of weeks to

10  be aware of what's going on.

11         You'll be monitored here by Pretrial Services as a

12  courtesy to Pretrial Services folks in Texas.

13         So, when you -- when you leave today, you need to go

14  meet with your Pretrial Services Officer.

15         Do they both have the same officer?

16         MS. MURRAY:  Yes, it will be Steven Daniels.

17         THE COURT:  Steven Daniels.  Okay.

18         Do you understand these requirements?

19         MR. MUNOZ-RODRIGUEZ:  Yeah.

20         MS. FLORES-RIVERA:  Yes.

21         THE COURT:  Will you agree to comply with them?

22         MS. FLORES-RIVERA:  Yes, ma'am.

23         MR. MUNOZ-RODRIGUEZ:  Yes, ma'am.

24         THE COURT:  These are -- there are about as strict --

25  the only thing I could do stricter is to put you on home

1  incarceration, which means you would never be able to leave at

2  all, but I want you to be able to work so that you can provide

3  for your family.  But you are very restricted otherwise.

4       What's today?  29th?

5       MR. CLIFFORD:  It is, Your Honor.

6    (Mr. Clifford confers with his client, off the record.)

7       THE COURT:  Okay.  I'm going to have my Courtroom

8  Deputy, if the lawyers would come forward, provide you with a

9  copy of these orders.

10       MR. CLIFFORD:  Yes, Your Honor.  And I know that the

11  -- I just want to make it -- make a -- not a clarification,

12  but just make it known that Ms. Flores had previously, before

13  even being arrested, moved to renew her expired Guatemalan

14  passport.  It is going to be here.  I have instructed her, and

15  I understand the Court has already instructed her, but to make

16  it crystal clear that she will turn that over as soon as she

17  gets it.

18       THE COURT:  Very good.

19       MR. CLIFFORD:  Thank you.

20       MS. MURRAY:  Ms. Flores-Rivera also has -- what I

21  believe it's an outstanding warrant.  I know her attorney

22  might have more information on that.  But just so the Court is

23  aware, I'm not sure if she will have to go back to Pulaski

24  today to get that taken care of.

25       THE COURT:  She has to post a bond, doesn't she?

1      MR. CLIFFORD:  Yes, Your Honor.  She -- yes, there

2  was a warrant for an issue, but that's already been taken care

3  of.  I was actually -- it's a 5,000 dollar surety bond.  And

4  that will be taken of.  She would have to be taken anyway to

5  be processed.

6      THE COURT:  So, you'll -- when is that going to be

7  taken care of?

8      MR. CLIFFORD:  It will be today.

9      THE COURT:  Today.

10      MR. CLIFFORD:  Yeah, it's already been taken care of

11  and everything is just ready for her to go.

12      THE COURT:  Okay.

13      MS. MURRAY:  So, Your Honor, we would just ask that

14  after she goes back to Pulaski, she comes back to the

15  Probation Office.

16      THE COURT:  Do you want her to wait until she takes

17  care of that to come back for --

18      MS. MURRAY:  I don't know if the Marshals will

19  actually release her today from the courthouse, or if she'll

20  have to be taken back to Pulaski in custody.

21      THE COURT:  Oh.

22      MR. CLIFFORD:  It's my understanding that she would

23  have to be taken back to Pulaski.

24      THE COURT:  Okay.  Okay.  I wasn't following that.

25      Okay.  So, you'll be taken back to Pulaski County and

1   processed out of custody.

2          MR. CLIFFORD:  Yes.  I think even that would be --

3          THE COURT:  For both of them?

4          MR. CLIFFORD:  -- it's my understanding for both of

5   them.  They won't -- they can't just be released.

6          THE COURT:  They're not in U.S. Custody today?

7          MR. CLIFFORD:  I believe they are, but they would

8   have to -- I think the paperwork has to be done for them to go

9   back and get their items that are at the jail.

10         THE COURT:  Got you.  Got you.  Okay.  I understand.

11         Yes, sir?

12         MR. BRADLEY:  If he doesn't have a warrant, then he

13  can be released from here.  If she has a warrant from Pulaski

14  County, she has to go back to deal with that issue, Your

15  Honor.

16         THE COURT:  Okay.  It takes a village to help me out

17  sometimes.

18         Okay.  You guys do it the way you need to do it.  How

19  about that?

20         But, Ms. Flores --

21         MS. MURRAY:  (Indiscernible.)

22         MR. CLIFFORD:  Just Little Rock.  Okay.

23         THE COURT:  -- Ms. Flores needs to know that she

24  needs to come over here as soon as she's processed out of

25  Pulaski County and taken care of that bond.

1        MR. CLIFFORD:  Yes, Your Honor.  We will.

2        THE COURT:  Okay.  All right.

3        And, Mr. Munoz, if you're processed out here, you

4   need to go directly to the Pretrial Services Office and meet

5   with Mr. Daniels.

6        MR. MUNOZ-RODRIGUEZ:  Yes, ma'am.

7        THE COURT:  Okay.  Thank you all.

8        Okay.  Is there -- I need to notify you guys before

9   we finish of what sanctions and penalties that you could face

10  if you don't comply with these conditions that I have put in

11  place.

12        First, if you fail to comply with these conditions, I

13  can promise you Ms. Williams is going to file a motion -- or I

14  guess it will be the counsel in Texas, will file a motion to

15  revoke you.  And that will be -- I'm assuming once you're --

16  once you appear in Texas, and are arraigned, the judge there

17  may issue a new set of conditions.  I don't believe you -- you

18  won't get another hearing.  But, when I see someone who has

19  had conditions placed in another state, I do a similar set of

20  conditions here as well.  So, if you don't comply with your

21  conditions, the Government will move to revoke you.  And if

22  you're revoked, that means you go to jail and that's where you

23  stay until your case is disposed of, and that could be a long

24  time.

25        Additionally, if you are found guilty of the charge

1   pending against you, the judge who sentences you could take

2   into account that you violated your conditions of release.

3   And that means you could get a higher sentence, if you're --

4   if you're found guilty, than you would otherwise have gotten,

5   just because you violated your conditions.

6          If you are found guilty and sentenced to prison, the

7   Bureau of Prisons could also take into account whether you

8   violated your conditions.  And that could affect where you

9   would be housed and what your privileges and your

10  classification would be.

11         If you commit a federal crime while you're on

12  release, then that would expose you to new charges and a term

13  of imprisonment of up to ten years on top of any sentence you

14  might get in this case.

15         If you knowingly fail to appear in court, not only

16  could you be revoked for that, but you could also be charged

17  with failure to appear as a separate crime.  And that could

18  result in additional charges, that could result in

19  imprisonment for that crime over and above any sentence that

20  you might get on the charge pending against you.

21         Finally, please know it's a felony, punishable by

22  between five and ten years and 250,000 dollar fine for you to

23  attempt to intimidate or tamper with or retaliate against a

24  victim, a witness, an informant, or an Officer of the Court.

25         Do you understand?

66

1          MR. MUNOZ-RODRIGUEZ:  Yes, ma'am.

2          MS. FLORES-RIVERA:  Yes, ma'am.

3          THE COURT:  Okay.  Is there anything else I need to

4   take up?

5          MS. WILLIAMS:  Not from the Government, Your Honor.

6          MR. CLIFFORD:  Nothing further, Your Honor.

7          MR. LUDWIG:  No, Your Honor.  Thank you.

8          THE COURT:  Okay.  And we're running a little behind

9   for the next hearing, I'm going to step out real quickly, and

10  I'll -- I'll step back in shortly.  I've got to get my other

11  file.  Colleen, do you need to take a break?  Okay.  I'm

12  sorry?  You do?

13          THE COURTROOM DEPUTY:  (Indiscernible.)

14          THE COURT:  Okay.  Court is in recess.

15     (Adjournment at 2:12 p.m.)

16              ELECTRONIC SOUND RECORDING CERTIFICATION:

17  I, court approved transcriber, certify that the foregoing is a

18  correct transcript from the official electronic sound

19  recording of the proceedings in the above-entitled matter.

20

21  /s/Robin Warbritton                 May 24, 2022
    Signature of Approved Transcriber   Date
22

23  Robin Warbritton
    Typed or Printed Name
24

25